### AFFIDAVIT IN SUPPORT OF APPLICATION
### FOR CRIMINAL COMPLAINT AND ARREST WARRANT

I, Special Agent Michael D. Little III, being sworn, states as follows:

### INTRODUCTION

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since January 2019. I am assigned to the Merrimack Valley Transnational Organized Crime Task Force of the FBI's Boston Division, where I conduct complex criminal enterprise investigations against violent criminals involved in a myriad of criminal activities to include the illegal distribution of narcotics, firearms trafficking, and associated violent crimes. Prior to joining FBI, I spent five years as a police officer with the Metropolitan Police Department of Washington, D.C., where I worked as a patrol officer, undercover officer, and Vice Detective. I conducted numerous drug investigations targeting violent criminals and received training on how to conduct drug investigations.

2. In the course of participating in investigations as it relates to drug trafficking, I have conducted or participated in surveillance; the controlled purchase of illegal drugs; the execution of search warrants; debriefings of subjects, witnesses, and informants; wiretaps; and reviews of consensually recorded conversations and meetings. I have also received training through my position as an FBI Special Agent involving narcotics trafficking. Through my training, education, and experience, I have become familiar with the manner in which drug traffickers conduct their illegal drug trafficking activity, to include their use of cellular telephones to contact drug customers, drug runners, drug associates, and sources of illegal drug supply. I am familiar with narcotics traffickers' methods of operation, including distribution, storage, and transportation of narcotics.

3. Based on my training and experience as a Special Agent, I am familiar with federal

1

narcotics laws. I know that it is a violation of Title 21, United States Code, Section 841, for any person to knowingly or intentionally manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance. Furthermore, I know that it is a violation of Title 21, United States Code, Section 846, for any person to conspire to violate the federal drug laws.

## PURPOSE OF AFFIDAVIT

4. This affidavit is being submitted in support of an application for a criminal complaint and arrest warrant charging Gino Hem, a/k/a "Staccs," a/k/a "Staxz" (YOB 1992) with the following violation of federal law: Distribution of and Possession with Intent to Distribute a Controlled Substance, to with fentanyl and cocaine base (21 U.S.C. § 841(a)).

5. I am familiar with the facts and circumstances of this investigation from my own personal participation, my review of records, and from oral and written reports made to me by agents of the FBI and other federal, state and local law enforcement agencies.

6. I submit this affidavit for the limited purpose of establishing probable cause for the requested warrant. I have not included each and every fact known to me or other law enforcement officers involved in this investigation. Rather, I have included only those facts that I believe are sufficient to establish probable cause for the issuance of the requested search warrants. All times herein are approximate.

## PROBABLE CAUSE

7. This investigation demonstrated that HEM is a drug trafficker actively selling fentanyl and cocaine base, a/k/a "crack cocaine," in Lowell since July 2025. Specifically, HEM met with a witness cooperating with the FBI, hereinafter referred to as "CW,"[1] and an FBI

---

[1] [redacted]

undercover employee, hereinafter referred to as the "UCE," on four dates and sold fentanyl and crack cocaine in monitored, recorded, and surveilled transactions.

          **I.**    **July 14, 2025, Controlled Purchase**

8.      Prior to July 14, 2025, Special Agents and other investigators (hereinafter referred to collectively as "Agents") provided CW with the phone number, ▇▇▇6789 ("Phone 6789"). They instructed CW to initiate telephonic contact with HEM, using the street name "Stacks" to attempt to arrange a meeting for the purpose of conducting a controlled purchase of narcotics from HEM. Agents know from intelligence, historical reporting, and prior law enforcement involvement that HEM is also commonly known as "Staccs" or "Staxz". The contacts were confirmed by Agents from a review of CW's phone, and images of the contacts were preserved and memorialized by Agents.

9.      On the afternoon of July 14, 2025, CW met Agents at a predetermined location. Agents followed up with CW regarding their contact with HEM as previously directed. Agents physically reviewed CW's contact list and confirmed that Phone 6789 was saved under the name, "Stacks."

10.     At 3:12 p.m. on July 14, 2025, CW received an incoming phone call from Phone 6789. CW placed the call on speakerphone in the presence of myself and Agents. The voice of

the caller was male. During this conversation, one Agent, based on his prior experience and previous interactions with HEM,[2] recognized the voice on the call as that of HEM.

11. HEM asked CW what they wanted to purchase. CW replied that they wanted to purchase a "a finger" (10 grams) of fentanyl. HEM stated, in sum and substance, that he did not have "brown," but agreed to get it and sell it to CW. In my training and experience, this statement, combined with the circumstances of this transaction, indicated that HEM was likely working with an active and proximate drug supplier. HEM also asked CW if they smoked "hard."[3] HEM quoted CW $500 for the "finger" of fentanyl ordered. HEM then told the CW that he would need an additional $100 for coordinating the fentanyl order. During this voice call and in a subsequent voice call also overheard by Agents, CW and HEM negotiated a meeting location. HEM instructed CW to meet him at ▮▮▮▮▮▮▮▮ in Lowell, and CW agreed.

12. Following the call, Agents again verified CW's contact information and confirmed that Phone 6789 was saved under the contact name "Stacks" and utilized to call CW.

13. Agents then utilized a standard set of procedures whereby they searched CW and CW's vehicle for money or contraband, with negative results. Agents provided CW with audio/video recording devices, a transmitter by which they could live monitor CW's interactions, and $600 in cash to complete the drug purchase from HEM.

14. Agents then surveilled CW to the pre-arranged buy location. At 3:42 p.m., CW received a voice call from HEM on Phone 6789. HEM asked CW for their estimated time of

---

[2] The investigator, Task Force Officer ("TFO") Chase Suong, is familiar with and has interacted with HEM from a previous investigation. In 2015, TFO Suong was aware HEM had an outstanding default warrant issued by a Massachusetts court for drug charges. TFO Suong located HEM in Lowell. HEM provided TFO Suong with his true name and date of birth, and HEM was subsequently placed under arrest for the warrant. HEM was then booked at the Lowell Police Department thereafter.

[3] Based on my training and experiences, I understood that when HEM used the terms "brown" and "hard", he was likely referring to fentanyl and crack cocaine.

arrival. This call was placed on speakerphone and was overheard by myself and Agents via the audio/video recording device and transmitter, and I recognized the voice of HEM. This contact with Phone 6789 was later corroborated by Agents after physically reviewing the call log on CW's phone after the controlled purchase. Images of this contact was preserved and memorialized by Agents.

15. Shortly after CW arrived at ▮▮▮▮▮▮▮▮, HEM was observed by Agents on the electronic surveillance device, approaching the front driver's side window of the CW's vehicle. Moments later, HEM departed the area on foot.

16. After the meeting, CW drove directly back to the predetermined meeting location. Agents maintained continuous physical surveillance of CW. Upon arriving at the predetermined meeting location, Agents secured the audio/video recording devices and transmitter, and they seized from CW a clear plastic bag containing an off-white powdery substance, suspected to be fentanyl. CW's vehicle and their person were searched for contraband and money, with negative results.

17. During the debriefing, CW told Agents that during the interaction with "Stacks," he handed the clear plastic bag containing an off-white powdery substance to CW, in exchange for the $600 cash.

18. Based on my training and experience the off-white powder substance appeared to be fentanyl. Additionally, I believe this based on various factors, including the information learned during this investigation and the packaging, size, shape & color of the substances.

19. Agents field tested the off-white powder substance using the TruNarc system direct test.[4] The substance tested positive for a cutting agent. Agents re-tested the substance using the

---

[4] TruNarc is a portable device that uses spectrometry and gas chromatography to analyze unknown substances. The

TruNarc system H-kit test. The substance in the clear plastic bag, subsequently field tested positive for the presumptive presence of fentanyl. The substance initially weighed approximately 11.1 grams; then 11.0 grams after the H-Kit test was conducted.

20. Agents reviewed the recording of this controlled purchase, and the video and audio quality are clear. Agents could clearly see the person in the video who interacted with CW, and I recognized that person as HEM. A still image from the recording is reproduced below, depicting HEM at the car window at the time of the drug transaction with CW.



**II.     August 15, 2025 Controlled Purchase**

21. Prior to August 15, 2025, Agents instructed CW to initiate telephonic contact with HEM to determine whether HEM would agree to meet with CW. The purpose of this contact was

---

device is commercially available and allows for the rapid and non-destructive identification of narcotics, narcotics precursors, essential chemicals, and cutting agents. In my experience, TruNarc results are highly accurate when analyzing substances consisting of methamphetamine or fentanyl. Based on my training and experience, I am aware that factors such as the purity level of a substance, the presence of multiple cutting agents, or the overall composition of the sample can interfere with both Raman spectroscopy and chemical reagent reactions, potentially leading to identification of cutting agents or inconclusive field test results. All suspected narcotics screened using the TruNarc system in this investigation have been forwarded to a U.S. Drug Enforcement Administration laboratory for confirmatory testing. The results of the laboratory testing are pending.

to arrange a controlled purchase of narcotics from HEM. The contacts were confirmed by Agents from a review of CW's phone, and images of the contacts were preserved and memorialized by Agents.

22. In the afternoon of August 15, 2025, CW contacted HEM using Phone 6789 via standard text messaging. In the text message exchange, which was done by CW in the presence of Agents, HEM, in sum and substance, agreed to sell CW two "fingers" (approximately 20 grams) of fentanyl for $1,000, and an ounce (approximately 28 grams) of crack cocaine (cocaine base) for $1,300. Also, HEM and CW agreed to meet at the same location as the previous drug deal, which CW understood to be ▮▮▮▮▮▮▮▮, at approximately 3:40 p.m. Agents verified CW's contact log and the text messages with Phone 6789 from CW's phone. Agents confirmed that the "Stacks" contact saved in CW's phone continued to be associated with Phone 6789. Images of these contacts were preserved and memorialized by Agents.

23. Following HEM's confirmation of the drug deal, Agents prepared CW for the controlled purchase. They searched CW and CW's vehicle for money or contraband, with negative results. They provided CW with audio/video recording devices, a transmitter, and $2,300 cash to complete the drug purchase from HEM. Agents then surveilled CW to the pre-arranged buy location.

24. At 3:33 p.m., CW received a voice call from HEM using Phone 6789. HEM asked CW for their estimated time of arrival. Agents and I overheard CW take a call via the audio/video recording device and transmitter. CW was overheard telling HEM that they were approximately five minutes away. This contact with Phone 6789 was later corroborated by Agents after physically reviewing the call log saved on CW's phone after the controlled purchase. Images of this contact was preserved and memorialized by Agents.

25. CW arrived at the buy location at 3:41 p.m. Moments later, HEM arrived in a car and drove alongside the CW's car. Surveillance personnel confirmed that HEM was the sole occupant of the car. During the debrief of CW, CW stated that HEM motioned for CW to follow him. CW then began driving and followed HEM's car via a circuitous route along the following streets: Pollard Street to Chapel Street, then to Walnut Street, Whipple Street, Newhall Street, Chambers Street, Irving Street, Pine Hill Street, and finally Prospect Street, where both vehicles parked. In my training and experience, countersurveillance methods are commonly employed by drug traffickers, and HEM's illogical route to the final location of the drug deal with CW was, in my opinion, an effort to thwart law enforcement investigation.

26. Moments later, based on my subsequent review of the preserved audio/video recording, HEM approached the front driver's side window of CW's car. HEM gave CW a clear plastic bag containing what appeared to be controlled substances, through the driver's seat window. HEM received cash from CW. These actions by a person I recognize to be HEM, are depicted in two still images from the recordings generated during the transaction, produced below.





27.    After the meeting, CW drove directly back to the predetermined meeting location. Agents maintained continuous physical surveillance of CW. Once at the predetermined meeting location, Agents secured the audio/video recording equipment and transmitter, and they seized from CW a clear plastic bag containing brown/off-white powder substance, suspected to be fentanyl, and a clear plastic bag containing the chunky white substance, suspected to be cocaine base. They confirmed that no additional contraband or cash was present in CW's car or on CW's person.

28.    During the debriefing, CW confirmed the person they met was the same person they believed to be "Stacks" from the July 14, 2025 drug deal. In addition, CW confirmed that they continued to communicate with "Stacks" using Phone 6789. CW reported that during the interaction, "Stacks" handed them a clear plastic bags containing a clear plastic bag containing brown/off-white powder substance, suspected to be fentanyl, and a clear plastic bag containing the chunky white substance suspected to be cocaine base, in exchange for cash. Agents reviewed the recording of this controlled purchase, and the video and audio quality is clear. CW's debriefing

9

was consistent with my observations from the audio-video recordings, in which I saw HEM interact with CW and make an exchange.

29. Based on my training and experience, as well as that of other Agents familiar with this investigation, the brown/off-white powder substance appeared to be fentanyl, and the white chunky substance appeared to be crack cocaine. Additionally, I believe this based on various factors, including the information learned during this investigation and the packaging, size, shape, and color of the substances.

30. Agents field tested the brown/off-white powder substance and the white chunky substance using the TruNarc system. Agents used the TruNarc system H-kit to test the brown/off-white powder substance using the TruNarc system H-kit test, which returned a positive result for Fentanyl Compound or Methamphetamine. Agents then conducted a TruNarc system direct test on the chunky white substance. The white chunky substance tested positive for cocaine base.

31. The brown/off-white powder substance weighed approximately 16.6 grams, and the white chunky substance weighed approximately 24.0 grams. The weights are slightly less but consistent with the quantities ordered by CW from the user of Phone 6789. In my training and experience, it is not uncommon for drug dealers to deliver less product than what was ordered by the customer, to increase profits, and these drug weights further corroborate HEM's usage of Phone 6789.

**IV. September 10, 2025, Controlled Purchase**

33. Prior to September 10, 2025, Agents instructed CW to initiate a series of calls and/or text messages to HEM using Phone 6789, to arrange another controlled purchase of narcotics. The contacts were confirmed by Agents from a review of CW's phone, and images of the contacts were preserved and memorialized by Agents.

32.     In the afternoon of September 10, 2025, and in the presence of Agents, CW contacted HEM using Phone 6789 via standard text messaging. In a text message exchange completed by CW in the presence of Agents, HEM, in sum and substance, agreed to sell one "finger" (approximately 10 grams) of fentanyl for $600 and two ounces (approximately 56 grams) of crack cocaine (cocaine base) for $2,600. CW advised HEM that they would be accompanied by a "customer," which was the cover for the UCE. Also, once again, HEM and CW agreed to meet in the vicinity of ▮▮▮▮ Street. Agents verified CW's contact log and the text messages with Phone 6789 from CW's phone. Agents confirmed that the "Stacks" contact saved in CW's phone continued to be associated with Phone 6789. Images of these contacts were preserved and memorialized by Agents.

33.     Agents searched CW for money or contraband, with negative results. They also provided CW with audio/video recording devices, a transmitter, and $3,200 cash to complete the drug purchase from HEM.

34.     At 3:20 p.m., CW and the UCE departed the predetermined meeting location and drove to the pre-arranged location of the deal with HEM. Agents maintained continuous surveillance of CW and the UCE. While enroute to the buy location, CW sent HEM several voice text messages, providing HEM with their estimated time of arrival. This telephone contact with Phone 6789 was later corroborated by Agents after physically reviewing the call log saved on CW's phone, following the controlled purchase, and images of this contact was preserved and memorialized by Agents. In addition, this call was taken in the presence of the UCE.

35.     CW and the UCE arrived in the vicinity of the buy location at 3:36 p.m. Moments later, HEM arrived on foot from behind the car and approached the front passenger's side window, where CW was seated. CW gave HEM $3,200 cash. HEM provided CW a Pringles can through

the passenger's window. The UCE asked if HEM would be willing to do future business with him. HEM agreed. HEM then departed the buy location.

36. CW and the UCE then drove directly back to the predetermined meeting location. Agents maintained physical surveillance of both CW and the UCE as they returned. Once at the meeting location, Agents secured the audio/video recording equipment and the transmitter, and they seized the Pringles can. From inside the Pringles can, Agents recovered clear plastic bags containing brown/off-white powder substance, suspected to be fentanyl, and chunky white substances, suspected to be cocaine base. The car and the person of CW were searched for additional contraband and any money, with negative results.

37. During the debriefing, CW reported to Agents that during the interaction with "Stacks," he handed the CW a "Pringles" brand chips container (can) in exchange for $3,200 cash. CW reported looking inside of the Pringles can and it contained a clear plastic bag containing brown/off-white powder substance, suspected to be fentanyl and a clear plastic bag containing the chunky white substance, suspected to be cocaine base. CW's reporting was consistent with my observations from reviewing the audio/video recordings generated during the meeting with HEM. The quality of the audio and video captured by the recording devices was clear. As depicted in the two still images produced below, the recordings clearly captured the person receiving cash in exchange for the Pringles can, who I recognize as HEM.

[continued on the next page]



38. Based on my training and experience, as well as that of other Agents familiar with this investigation, the brown/off-white powder substance appeared to be fentanyl, and the white chunky substance appeared to be crack cocaine. Additionally, I believe this based on various factors, including the information learned during this investigation and the packaging, size, shape, and color of the substances.

39. Agents field tested the brown/off-white powder substance using the TruNarc system direct test. The system returned inconclusive results. Due to packaging hazards and fentanyl exposure possibility, Agents did not conduct a TruNarc H-Kit test in this instance. Agents then conducted a TruNarc system direct test on the chunky white substance, which returned a positive result for cocaine base.

40. The brown/off-white powder substance weighed approximately 9.4 grams, and the white chunky substance weighed approximately 54.9 grams. Like the substances previously purchased from HEM on August 15, 2025, the measured weights of the suspected fentanyl and cocaine base were slightly lower than ordered. Nevertheless, in my training and experience, the

13

quantities seized were again consistent with CW's orders and corroborate HEM's usage of Phone 6789.

### V. October 3, 2025, Controlled Purchase

41. Prior to and on October 3, 2025, Agents instructed UCE to contact HEM using Phone 6789 in an attempt to negotiate another controlled purchase of narcotics from HEM. The contact was successful. HEM agreed to sell the UCE one ounce (approximately 28 grams) of crack cocaine (cocaine base) for $1,300, on October 3, 2025.

42. The UCE met with Agents at a predetermined meeting location at 11:40 a.m. on October 3, 2025, to prepare for a potential controlled purchase from HEM. At approximately 12:04 p.m., in the presence of Agents, the UCE received a voice call from HEM, via Phone 6789. This call was placed on speakerphone, and I recognized the voice of HEM from the investigation. HEM stated, in sum and substance, that he needed 25 minutes before meeting the UCE.

43. At 12:16 p.m., HEM, via Phone 6789, provided the UCE the address of ▮▮▮▮▮, Lowell, as the meeting location. Agents equipped the UCE with an audio/video recording device, and they provided $1,300 cash to use to complete the transaction with HEM. The UCE then departed the predetermined meeting location, and surveillance personnel established surveillance positions in the vicinity of the meeting location. At 12:34 p.m., the UCE arrived at ▮ ▮▮▮▮▮▮, parked, and waited. At 12:41 p.m., the UCE telephonically contacted HEM using Phone 6789 and announced their arrival.

44. At approximately 12:52 p.m., surveillance personnel observed HEM exit 128 Chapel Street and walk towards the UCE's car. HEM entered the car on the front passenger side. HEM directed UCE to drive. While driving, HEM and UCE engaged in a brief conversation. During this conversation with HEM, the UCE asked to buy an additional drug, specifically a

quantity of fentanyl. HEM told the UCE, in sum and substance, that he would look into getting the requested amount for the UCE, and he would let the UCE know momentarily. The UCE gave HEM $1,300 cash, and HEM gave the UCE a clear plastic bag containing a chunky white substance. Moments later, at 12:55 p.m., surveillance personnel observed the UCE stop the car and HEM exit and depart the area on foot.

45. Thereafter, the UCE spoke to HEM in voice calls over Phone 6789 at about 1:23 p.m. and 1:29 p.m., in attempts to advance a fentanyl transaction with HEM, without success. Following the drug transaction and subsequent phone contacts with HEM, UCE returned to the predetermined meeting location at 1:45 p.m. Agents secured the audio/video recording equipment, which they confirmed had functioned properly. The UCE provided the undersigned Agent with a clear plastic bag containing a chunky white substance suspected to be cocaine base. Based on my training and experience, as well as that of other Agents familiar with this investigation, the white chunky substance appeared to be crack cocaine. Additionally, I believe this based on various factors, including the information learned during the course of this investigation and the packaging, size, shape and color of the substance. Finally, Agents conducted a TruNarc system direct test on the chunky white substance, which returned a positive result for cocaine base. The suspected cocaine base weighed approximately 29.2 grams.

## CONCLUSION

46. Based on my training and experience, consultation with other Agents and law enforcement officers, and all the facts and opinions set forth in this affidavit, there is probable cause to believe that on multiple dates in the District of Massachusetts – specifically on July 14, 2025, August 15, 2025, September 10, 2025, and October 3, 2025 – HEM committed the offense Distribution of and Possession with Intent to Distribute a Controlled Substance, to wit: fentanyl

and cocaine base, in violation of 21 U.S.C. § 841(a)(1). Accordingly, I request that the Court issue the requested criminal complaint and arrest warrant for HEM.

Sworn to under the pains and penalties of perjury,

/s/ Michael D. Little III

_____
Michael D. Little III
Special Agent
Federal Bureau of Investigation

Electronically sworn to and subscribed telephonically in accordance with Federal Rule of Criminal Procedure 4.1 on October 21, 2025.

/Page Kelley/
HON. M. PAGE KELLEY
UNITED STATES MAGISTRATE JUDGE

16